## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN HARVEY, Individually and on Behalf of all Others Similarly Situated,<br><br>    Plaintiff,<br><br>vs.<br><br>VANGUARD CHESTER FUNDS, MORTIMER J. BUCKLEY, CHRISTINE M. BUCHANAN, JOHN E. SCHADL, EMERSON U. FULLWOOD, AMY GUTMANN, F. JOSEPH LOUGHREY, MARK LOUGHRIDGE, SCOTT C. MALPASS, DEANNA MULLIGAN, ANDRÉ F. PEROLD, SARAH BLOOM RASKIN, PETER F. VOLANAKIS, and THE VANGUARD GROUP, INC.,<br><br>    Defendants. | Case No. _____<br><br><br>**COMPLAINT – CLASS ACTION**<br><br><br>Jury Trial Demanded |

Plaintiff John Harvey ("Plaintiff" or "Harvey"), individually and on behalf of all other persons similarly situation, by Plaintiff's undersigned counsel, for Plaintiff's complaint against Defendants (defined herein), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and believe as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included among other things, a review of Defendants' public documents, press releases published by and regarding Defendants, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     Vanguard's "core purpose" is "[t]o take a stand for all investors, to treat them fairly, and to give them the best chance for investment success."[1]  Vanguard was created with the purpose of offering low-cost mutual fund investments directly to smaller investors.

2.     Mutual funds are structured as trusts and managed by trustees. In mutual funds, investors buy shares in the fund and the fund itself buys assets, including stocks and bonds. The trustees, officers, and advisors of mutual funds are required to manage the fund for the benefit of all its shareholders no matter how big or small the investors are. The fiduciaries cannot favor larger investors to the detriment of smaller investors.

3.     Vanguard has usually followed its core purpose, as its a well-regarded and successful investment company. However, in December 2020, Vanguard harmed a group of smaller investors, the very people the company was created to serve, in order to benefit larger retirement plans that support its bottom line.

4.     Vanguard offers target date retirement funds which do not require investors to actively engage in the investments. The central philosophy to Vanguard's mutual funds is "set it and forget it."[2] Target date funds are recommended by financial advisors as an option where investors can "literally invest their entire portfolio"[3] without the need to monitor the funds actively. As Vanguard markets them, the funds are "an all-in-one solution for those without the time,

---

[1] Vanguard, "Facts and Figures," https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/sets-us-apart/facts-and-figures.html. ("Facts and Figures").

[2] Chron.com, "Vanguard founder's advice: Set it and forget it," https://www.chron.com/business/article/Vanguard-founder-s-advice-Set-it-and-forget-it-1780677.php

[3] Morningstar.com, "A Set-It-and-Forget-It Target-Date Series from Vanguard," https://www.morningstar.com/articles/929967/a-set-it-and-for get-it-target-date-series-from-vanguard.

willingness, or ability to build and manage their own portfolio."[4]

5.      The target date funds are organized as a trust and managed by trustees. The investment strategy for the target funds is based on a target retirement year.

6.      Vanguard's "set-it-and-forget-it" target date funds are attractive investments as it allows investments to grow in value and compound over many years (until retirement and beyond), without being liquidated, distributed, and taxed. For tax-advantaged retirement plans, large capital gain distributions are harmless as these plans merely reinvest the cash without any tax ramifications. For smaller, taxable investors, however, capital gain distributions mean large tax bills.

7.      Vanguard offers two kinds of target date funds. The first are "Retail Funds" which are for individuals and retirement plans with less than $100 million. The second are "Institutional Funds" which are for retirement plans with over $100 million. The Retail and Institutional Funds have the same strategy and investments, but the Institutional Funds are charged lower management fees than Retail Funds.

8.      Federal tax laws require funds to allocate any capital gains it realizes to its shareholders *pro rata* when the target date fund sells assets and receives cash. *See* 26 U.S.C. § 852(a)(1).

9.      For those investors who hold their target date funds in tax-advantaged accounts, they do not incur any tax liability but instead can reinvest these distributions. Larger investors, including retirement plans hold the target funds in tax-advantaged accounts.

10.      However, many smaller, everyday investors hold their target date funds in taxable

---

[4] Vanguard, "Vanguard Broadens Access to Low-Cost Institutional Target-Date Funds," https://pressroom.vanguard.com/news/Press-Release-Vanguard-Broadens-%20Access%20-to-Low-Cost-Institutional-Target-Date-Funds-12-11-2.html ("December Press Release").

accounts. Vanguard markets and sells its target date funds to this category of investors. These investors must pay taxes on capital gain distributions, even when these distributions are automatically reinvested. If there is a significant sell-off of assets in their target date funds, these investors face significant tax bills.

11.     Target date funds do not usually sell many assets so capital gains distributions are typically minimal. Starting in December of 2020, however, Vanguard decided to permit access to its Institutional Funds to all retirement plans with at least $5 million, rather than the previous $100 million minimum. This decision caused an enormous sell off from its Retail Funds. Retirement plans that were previously invested in the Retail Funds could sell their shares and transfer over to Institutional Funds that invested in the same assets but charge lower management fees. This is exactly what happened.

12.     Retail Funds had to sell a large portion of its assets so that it would have the cash on hand to redeem so many shares. As a result, the Retail Funds incurred a capital gains on the assets sold, causing in unprecedented capital gain distributions. Those who had their investments in taxable accounts were levied with tax liabilities.

13.     Vanguard did not have to go this route in its quest to provide cost-effective options for larger investors. Vanguard could have implemented other changes which would not have harmed smaller investors with taxable accounts. Instead at this time, in gross violation of its fiduciary and other legal duties, Vanguard did not contemplate other options which would have avoided injuring smaller, taxable investors.

**PARTIES**

7.     Plaintiff is domiciled in Oklahoma. He invested in Vanguard's Retirement Income (VTINX), 2015 (VTXVX), and 2020 (VTWNX) Retail Funds, in taxable accounts.

4

8.    The proposed class includes taxable, Retail Fund investors throughout the country.

9.    Vanguard Chester Funds (the "Trust") means the Vanguard's target date funds which are organized as a Delaware statutory trust. The Trust has shareholders throughout the country.

10.    At all relevant times, the Trust and its underlying funds, including the Retail and Institutional Funds, were managed by the same trustees and officers (the "Trustee and Officer Defendants"). The Trustee and Officer Defendants and their domicile are identified as follows:

| Defendant | Role | Domicile |
|-----------|------|----------|
| Mortimer J. Buckley | Chief Executive Officer ("CEO"), Chairman of the Board, and President of the Trust. Trustee | Pennsylvania |
| Christine M. Buchanan | Chief Financial Officer ("CFO") | Pennsylvania |
| John E. Schadl | Chief Compliance Officer ("CCO") | Pennsylvania |
| Emerson U. Fullwood | Trustee | New York |
| Amy Gutmann | Trustee | Pennsylvania or New York |
| F. Joseph Loughrey | Trustee | Indiana |
| Mark Loughridge | Lead Independent Trustee | Connecticut |
| Scott C. Malpass | Trustee | Indiana or Florida. |
| Deanna Mulligan | Trustee | New York |
| André F. Perold | Trustee | Massachusetts |
| Sarah Bloom Raskin | Trustee | Washington, DC or Maryland |
| Peter F. Volanakis | Trustee | New Hampshire |

11.    The "Trustee Defendants" means Defendants Mortimer J. Buckley, Emerson U. Fullwood, Amy Gutmann, F. Joseph Loughrey, Mark Loughridge, Scott C. Malpass, Deanna Mulligan, André F. Perold, Sarah Bloom Raskin, and Peter F. Volanakis.

12.    The "Officer Defendants" means Mortimer J. Buckley, Christine M. Buchanan, and John E. Schadl.

13.    The Vanguard Group, Inc. ("Vanguard Group") is incorporated in Pennsylvania with headquarters at 100 Vanguard Boulevard, Malvern, Pennsylvania, 19355. The Vanguard Group provides "virtually all" of the "corporate management, administrative, and distribution services" for the Trust. It also provides investment advisory services to the target date funds.[5]

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class is a citizen of a State different from any Defendant.

15.    The Court has personal jurisdiction over the Trust, and each Trustee and Officer Defendant, because the claims arose from, or relate to, Trust management decisions that were made and/or carried out by the Trustee and Officer Defendants (or their agents) at Vanguard's Pennsylvania headquarters. For instance, Trustee meetings occurred there, the Trustees and Officers worked with the Vanguard Group to execute fund management decisions there, the Trustee and Officer Defendants entered into relevant contractual relationships centered there (including service contracts with the Vanguard Group), and the mailing address of the Trustees, for Trust business, is P.O. Box 876, Valley Forge, Pennsylvania 19482. By conducting fund business in Pennsylvania, each Defendant purposefully availed himself, herself, or itself of the privilege of

---

[5] Vanguard Chester Funds, "Statement of Additional Information January 31, 2022" at B-35, https://advisors.vanguard.com/pub/Pdf/sai059.pdf ("Chester Funds' Statement of Additional Information").

6

doing business in the state. In addition, certain Trustee and Officer Defendants are domiciled in Pennsylvania.

16.     The Court has personal jurisdiction over the Vanguard Group because its principal place of business is in Pennsylvania.

17.     For the Trust and Trustee/Officer Defendants, venue is proper under 28 U.S.C. § 1391 because a substantial part of Defendants' conduct giving rise to the claims occurred in this District, at Vanguard's headquarters. Also, certain Trustee and Officer Defendants reside in this District.

18.     For the Vanguard Group, venue is proper because it resides in this District.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Target Date Funds*

19.     Vanguard is one of the largest investment companies in the world with over $8 trillion assets under management.[6] To remain competitive, Vanguard seeks to obtain the most assets under management, while simultaneously maintaining low fees. It is "the largest mutual fund provider" and is engaged in an ongoing "price war" with its competitors.[7]  Moreover, "Vanguard is the largest target-date fund manager in the industry and the number one recipient of cash flowing into target-date funds."[8]

20.     Vanguard's target date funds invest money across asset classes based on a specific or target retirement year, such as 2015 or 2050. The funds then buy and maintain other Vanguard products such as Vanguard stock and bond index funds. When the target date approaches and investors are closer to retirement, these funds are more conservatively invested, increasing its

---

[6] Facts and Figures, *see* footnote 1.
[7] AP News, "Fidelity slashes fees as funds battle for investors," https://apnews.com/article/1f2ed0e747f6495faa18db2d55a17ff2
[8] December Press Release, *see* footnote 4.

holding in bonds, which are commonly more stable, and reducing its holding in stocks which can be more volatile.

21.     Vanguard offers two levels of target date funds. Retail Funds are available for individuals and retirement plans smaller than $100 million. The Institutional Funds are for retirement plans with over $100 million. These two kinds of funds have the same investment in the underlying Vanguard funds and have the same strategy and managers. Besides the minimum required investment, the only difference is that the Institutional Funds have lower management fees than the Retail Funds.

14.     Federal tax law requires that target funds distribute any capital gains to shareholders when the funds sell assets.

22.     If the target date fund is held in a tax-advantaged account (*i.e.* a 401(k)), then these investors can simply re-invest the cash without paying any taxes. According to Vanguard, "four out of five participants in 401(k) plans…at Vanguard are now invested in a target-date fund."[9] Most of the investors in Vanguard's target date funds have their holdings in tax-advantaged accounts, like retirement plans, that are excused from paying tax on capital gains.

23.     But if the funds are held in taxable accounts, distributions are subject to federal and state taxes which can be substantial, even taxed over 20% for these gains. Regardless if the shareholder does not receive any cash and the distribution is reinvested in the fund, these investors are still required to pay taxes. Large capital gains distributions means large capital gains tax liabilities for investors with taxable accounts.

24.     It is not common for target date funds to sell many assets. Accordingly, capital gains distributions and associated taxes are usually small for investors in these funds. Mutual funds

---

[9] *Id.*

tend to have some cash readily available in order to pay for typical redemptions. This way, usual redemptions do not require the fund to sell substantial assets. It is not uncommon for shareholders of the funds to receive small capital gains distributions from stock dividends and potentially from the slow shifting of the portfolio to include more bonds and fewer stocks. These distributions, however, are usually under a percent of the overall value of the fund so it is reasonable for investors to expect insignificant capital gains distributions from their funds.

25.     In addition to its institutional clientele, Vanguard markets and sells its Retail Funds directly to consumers. Accordingly, there is a small group of investors who are everyday consumers who hold shares of Vanguard's target date funds in their taxable accounts. According to FINRA, "33 percent  of U.S. households own taxable investment accounts, like stocks, bonds or  mutual funds." [10]

26.     Investors who participate in the Retail Funds are in the fund for long term and beholden to the decisions that Vanguard's management makes. Investors who hold target date funds in taxable accounts cannot sell their shares or purchase alternative investments without realizing capital gains and in turn, a tax liability on these capital gains.

### *Defendants Trigger Massive Sell-Offs*

27.     Vanguard is motivated to maintain good relationships with managers of its retirement plans as the majority of the money in Vanguard's target date funds is from these company and institutional retirement plans.

28.     In order attract and serve these investors, in December of 2020, Vanguard intentionally triggered an unprecedented sell-off from its Retail Funds.

---

[10] FINRA, "A Snapshot of Investor Households in America," https://www.sec.gov/spotlight/fixed-income-advisory-committee/finra-investor-        education-foundation-investor-households-fimsa-040918.pdf

29.     Prior to December 2020, in order to participate in the Institutional Funds, investors, such as retirement plans, had to have at minimum $100 million invested. Retirement plans and investors with less than $100 million could only participate in the Retail Funds. The Institutional Funds are more desirable than the Retail Funds as the Institutional Funds are subject to lower fees than the Retail Funds.

30.     In or around December 2020, Vanguard decided to lower the minimum requirement to participate in its Institutional Funds from $100 million invested to $5 million invested. This was done for Vanguard to maintain its competitive advantage against other providers of mutual fund.

31.     By Vanguard permitting retirement plans to participate in the Institutional Funds, this triggered a massive sell-off in the Retail Funds as plans needed to sell their assets to move them over to the Institutional Fund. As a result, the Retail Funds had to sell a substantial portion of their assets in order to have cash to redeem these shares. This would result in the Retail Funds realizing capital gains on any assets they sold that had appreciated in value. As legally required, the Retail Funds had to distribute those capital gains as cash to the investors remaining in the Retail Fund. The results were substantial capital gains distributions that would impact only smaller investors whose funds were held in taxable accounts as they are required to pay capital gains taxes. Larger, institutional investors with tax-advantaged accounts were spared from these tax liabilities.

32.     Defendants could have easily avoided the damage it caused to investors with taxable accounts. Options available to Defendants included:

      i.   *Reducing the fees for Retail Funds for plans with at least $5 million invested.* To do this, Defendants could have restructured share classes, reclassified shares or other methods. Vanguard, as well as other mutual funds, commonly

implement fee-tiering. If the fees were restructured, it would have helped retirement plans as well as avoided adverse tax liabilities for smaller, taxable investors.

ii. *Merging the Retail and Institutional Funds*. It is common to merge similar funds in the mutual fund industry. This could be easily accomplished as the Retail and Institutional Funds were the same but for their management fees. The funds had the same strategy, asset mix of other Vanguard funds, and management. Merging the Retail and Institutional Funds could have been done and avoided tax consequences for any shareholders. Vanguard could then adjust or tier the fees in the merged fund.

33.    Rather than selecting one of these viable options, Defendants decided to reduce the Institutional Fund investment minimum immediately, while simultaneously disregarding smaller, taxable investors and igniting a massive sell-off.

34.    Vanguard chose the "massive sell-off" option, stating in a December 2020 press release from its headquarters in Valley Forge, Pennsylvania where important decisions are made:

> Effective immediately, the plan-level minimum investment requirement [for the Institutional Funds] has been reduced to $5 million from $100 million, enabling more 401(k) and 403(b) plan sponsors to offer these low-cost, broadly diversified options to their retirement plan participants.[11]

35.    In announcing Vanguard's reduction in the minimum investment requirement for Institutional Funds which focused on the benefit to retirement plans, but ignored the impact on smaller, taxable investors, Vanguard incorrectly stated: "Vanguard works tirelessly to improve

---

[11] December Press Release, *see* footnote 4.

outcomes for plans sponsors and their participants." *Id.*

36.    When the minimum investment required for Institutional Funds was lowered, it "set off an elephant stampede, as multimillion-dollar corporate retirement plans got out of the standard target funds and into the Institutional equivalents."[12]

37.    In the time following the December 2020 decision to reduce the minimum investment for Institutional Funds, retirement plans with $5 million to $100 million sold their Retail Fund shares and transferred over to the Institutional Funds. The Retail Funds were forced to sell assets to raise cash to redeem the shares. *The Wall Street Journal* reported on the size of the funds falling, using the examples that "assets at Vanguard's 2035 target fund shrank to $38 billion from $46 billion" and the "2040 fund shriveled to $29 billion from $36 billion."[13] This was an extraordinary sell-off of 15%, or more, of the assets of the entire fund.

38.    When the Retail Funds sold assets, they realized capital gains. As required, Vanguard distributed the capital gains to investors *pro rata*. As a result in 2021, Retail Fund investors received capital gains distributions at least 40 times larger than ever before as detailed in the following chart published by *Morningstar*:

---

[12] *The Wall Street Journal*, "The Huge Tax Bills That Came Out of Nowhere at Vanguard," https://www.wsj.com/articles/vanguard-target-retirement-tax-bill-surprise-11642781228 ("*WSJ* Article").

[13] *Id.*



39.    For target date funds, if investors with taxable accounts began to withdraw money after the target retirement year (*e.g.*, 2050), they would potentially have to pay capital gains taxes then. But by being forced to pay taxes on the capital gains distributions now, these investors lost the ability to earn compounding returns on that money for many years.

40.    This loss of compounding returns is substantial. The 100-year average return for the S&P 500 is over 10%.[14] At a conservative, 8% rate of return, money doubles in under 10 years, which is far shorter than, say, the 2040 target date. By being forced to pay taxes now, taxable investors lost the capability to double their money, or even more. The majority of investors set their capital gain distributions to reinvest in the fund immediately and automatically. Accordingly, the tax liability comes without any cash to pay towards this bill which could force these investors to sell assets and potentially incur even more capital gains tax liability.

41.    Not only do taxable investors have to pay tax liabilities, they have to pay

---

[14] Investopedia, "What Is the Average Annual Return for the S&P 500?"
https://www.investopedia.com/ask/answers/042415/what-average-annual-return-sp-500.asp

Vanguard management fees in exchange for Defendants making decisions that caused them harm.

42.    The claims asserted herein are direct claims, not derivative claims. The taxable investors themselves were injured, not the Trust. The injury to the taxable investors was independent of any injury to the Trust (*i.e.*, to the funds themselves). Shareholders who hold their Retail Funds in tax-advantaged accounts were not harmed and the larger, non-taxable investors benefitted since they received access to the Institutional Funds. Vanguard caused a "change that benefited big clients [and] left little ones holding the bag."[15] Accordingly, it would be unjust for the Trust itself to receive the benefit of any recovery.  Instead, the recovery must go directly to taxable investors that were damaged.

### *Vanguard Changes Course Deciding to Combine the Retail and Institutional Funds*

43.    In September 2021, a few months after sparking the massive sell-off, Vanguard changed its strategy, deciding to merge the Retail and Institutional Funds.

44.    According to Vanguard, the "merged funds will retain the same investment strategy, asset allocations, and glide path"[16] so this change would be easy to implement. Unlike its December 2020 decision, there were no tax consequences for any investors as a result of merging the Retail and Institutional Funds. Moreover, Vanguard even received a tax opinion confirming that there would be no tax consequences for the merger of the funds.[17]

45.    When Vanguard decided to merge the funds, Defendant Buckley, Vanguard's CEO and Chairman, stated in part: "Vanguard will continue to innovate for clients, and our unique client

---

[15] *WSJ* Article, *see* footnote 12.

[16] Vanguard, "Vanguard to Lower Investor Costs by an Estimated $190 Million through Enhancements to its Target Retirement Series," https://pressroom.vanguard.com/news/Press-Release-Vanguard-to-Lower-Investor-Costs-by-an-Estimated-190M-Through-Enhancements-to-TRFs-092821.html ("September Press Release").

[17] Tax Opinion issued by Dechert, https://www.sec.gov/Archives/edgar/data/0000752177/000113743922000131/taxopinion.htm

-owned structure allows us to share our success with clients through lower fees[.]"[18] But Buckley and Vanguard were really only discussing their success with larger retirement plans. To achieve this success, they harmed ordinary, taxable investors.

46.    Vanguard's change of course was too late as Defendants already harmed taxable investors which could not be erased. These investors already received unnecessary capital gains distributions and incurred associated tax liabilities.

47.    Combining the Retail and Institutional Funds, a decision reached in September 2021, could have just as easily been made in December 2020 and prevented the harm to taxable investors. If Defendants merged the funds in December 2020, the smaller, taxable investors would not have be injured by incurring the larger capital gain distributions which resulted in large tax liabilities as there would not have been a massive sell-off in the Retail Funds.

48.    Vanguard recognizes and states that its legal duties to shareholders are central to its mission, stating "Core to our mission to give investors the best chance for investment success is our fiduciary duty to maximize long-term investment returns for our funds' shareholders." [19]

49.    Each Defendant had legal duties to all investors, including fiduciary duties. Deciding to reduce the minimum investment for the Institutional Fund instead of taking other actions which would result in lowered fees for retirement plans without triggering a massive sell-off in Retail Funds, violated these duties.

50.    Defendants intentionally caused asset sell-offs, resulting in large capital gains distributions and tax liabilities for taxable investors that could have been deferred for many years, or even eliminated altogether. Instead of maximizing long-term investment returns for all of its

---

[18] September Press Release, *see* footnote 16.
[19] Vanguard, "Our approach to ESG investing: Engage, allocate, and avoid," https://corporate.vanguard.com/content/corporatesite/us/en/corp/articles/our-approach-to-esg-investing.html

customers, Vanguard did the opposite.

51.    Each Defendant was responsible for this decision. Each Defendant is jointly responsible, or in the alternative, each Defendant is individually responsible.

### *Defendants' Responsibilities*

52.    The decision to lower the minimum investment in the Institutional Funds was not one that the Defendants had to make in a particular time period. There was no pressing deadline for this change. Defendants had complete control over when, and how, Vanguard chose to lower fees for its retirement plans. The Trustee and Officer Defendants controlled the structure of both the Retail and Institutional Funds. Vanguard even controlled the underlying investments which they themselves were Vanguard funds. Defendants had the time and opportunity they needed to make changes to its target date funds diligently and prudently.

53.    The Trustee Defendants are responsible for the Trust's governance including the target date funds. The Trustees are responsible for coordinating the funds as well as managing each fund, in the interest of all of its shareholders. According to Vanguard, the "trustees believe that their primary responsibility is oversight of the management of each fund for the benefit of its shareholders, not day-to-day management."[20] The Trustee Defendants are required to manage the funds for the benefit of all "its shareholders" – whether those holding in taxable or non-taxable accounts, and cannot favor those holding in retirement plans.

54.    The Trustee Defendants "set broad policies for the funds" including "monitor fund operations" and monitor "regulatory compliance."[21] The Trustee Defendants are responsible for all Retail and Institutional funds in the Chester Trust and coordinate their management. Accordingly, the Trustee Defendants were ultimately responsible for the sell-off decision that

---

[20] Chester Funds' Statement of Additional Information, *see* footnote 5.
[21] *Id.*

harmed taxable investors.

55.     The Officer Defendants are also responsible for the damage done to taxable investors. The Officer Defendants were involved in the sell-off decision as this decision required the Officer Defendants' involvement, advice, and approval from the Trust's CEO, CFO and CCO. The CEO would evaluate the overall strategy; the CFO would evaluate the financial and tax consequences; and the CCO would evaluate the legality. Both the Trustee and Officer Defendants have legal duties to manage the funds for the benefit of all shareholders.

56.     The Vanguard Group "manages the day-to-day operations of the funds under the direction of the board of trustees."[22] The Vanguard Group also serves as the investment advisor to the target date funds. The Vanguard Group has a legal duty to manage the funds for the benefit of all shareholders. The Vanguard Group is liable as it would have been involved in the sell-off decision, would have advised on it, and consented to it.

57.     The changes in the minimum investments for the Institutional Funds was made specifically to favor one class of investors to the detriment of other investors. Defendants' decisions benefited retirement funds that are a sizable portion of Vanguard's business and help their bottom line. This was a red flag that demanded careful attention to conflicts between investors.

58.     There are only two possible explanations for what occurred, and each involve a fundamentally broken decision-making process and a grossly negligent, reckless, or bad faith breach of fiduciary duty by each Defendant.

59.     The first explanation is that Defendants ignored their legal duties to taxable investors and failed to even consider the harm that would result by their decision. This would

---

[22] Chester Funds' Statement of Additional Information, *see* footnote 5.

mean that Defendants made the sell-off decision without: (i) informing themselves of, and considering, the capital gains distributions; (ii) informing themselves of, and considering, the tax consequences for taxable investors; and (iii) identifying, exploring, and duly weighing alternative paths that would avoid this harm.

60.    Under this explanation, Defendants grossly and recklessly breached their fiduciary duties by failing to inform themselves and taking necessary steps to protect all investors, including smaller, taxable investors in the Retail Funds.

61.    The second explanation is that Defendants did recognize that their decision would harm taxable investors, but disregarded this harm because Vanguard places more value on the retirement plans than it does for retail investors. This at a minimum is a reckless breach of Defendants' duties to ordinary investors. The harm that would result to taxable investors was not a potential risk, it was a certainty. Any disregard of that harm was bad faith. Defendants consciously put the financial interests of large retirement plans above the interests of smaller, taxable investors.

62.    Regardless of how Defendants reached its decision to trigger the massive sell-off, Defendants had all the information they needed available at their disposal. In fact, it was known to Defendants but they consciously disregarded it.

63.    When Defendants decided to permit retirement plans with over $5 million to participate in the Institutional Funds, the sell-off was not just plausible, it was intended. Defendants wanted larger retirement plans to sell their Retail Fund shares and use the proceeds to buy Institutional Fund shares. This was the entire purpose of reducing the minimum investment to participate in the Institutional Funds. This was not an unforeseen sell-off caused by an external event such as a market shock. Defendants intentionally caused the sell-off in order to

accommodate to retirement plans.

64.    Each Defendant knows that many retail investors hold target date funds in taxable accounts. Under Defendants' direction Vanguard: (i) markets and sells its Retail Funds directly to consumers, including those with taxable accounts; (ii) tracks what Vanguard accounts (taxable or non-taxable) are used to buy target date funds; and (iii) specifically recognizes, in fund prospectuses, that investors will use taxable accounts to hold target date funds.[23]

65.    Additionally, each Defendant knows that tax laws require target date funds to distribute any capital gains it realizes to its investors as cash. Defendants also know that such distributions will result in capital gains taxes for investors who hold the funds in their taxable accounts. Vanguard's prospectuses recognize that, unlike its tax-advantaged investors, its taxable investors are vulnerable to capital gains distributions:

> The Fund's distributions may be taxable as ordinary income or capital gain. If you are investing through a tax-advantaged account, such as an IRA or an employer-sponsored retirement or savings plan, special tax rules apply.[24]

Defendants were thus aware that, unlike Vanguard's tax-advantaged investors, its taxable investors are vulnerable to capital gains distributions.

66.    The harm to taxable investors from the sell-off Defendants caused was not an uncertain or unknown risk that would require care for Defendants to discover, but the harm was certain, obvious, and known to Defendants. It was simply a matter of looking at how many plans had more than $5 million invested, calculating the likely outflow, recalling that taxable investors exist, and considering the tax consequences for them.

---

[23] Vanguard, "Vanguard Target Retirement 2020 Fund Summary Prospectus" at 9, https://personal.vanguard.com/pub/Pdf/sp682.pdf?2210177766 (discussing taxable investors).
[24] *Id*.

67.     Defendants had several alternatives and easily-available options to accomplish their desired result of remaining competitive with more investors without harming taxable investors. Defendants could have reduced fees in the Retail Funds for plans with over $5 million. Alternatively, Defendants could have merged the Retail and Institutional Funds in December 2020 as they eventually did in September 2021.

68.     Incredibly, after the sell-off decision was made, Defendants did nothing for months. Instead, Defendants observed its customers being harmed with the sell-off and did not take remedial action. In the months following December 2020, retirement plans in the Retail Funds redeemed their shares, requiring the funds to sell assets and realize capital gains. Defendants did nothing to stop or reverse the sell-off but sat back and watched it unfold. It took Defendants several months, after the damage was done, to merge the Retail and Institutional Funds.

### *Defendants Damaged Plaintiff*

69.     Plaintiff held Retail Fund shares in one or more taxable accounts during the relevant timeframe. Plaintiff suffered tax liabilities caused by Defendants' actions and paid Vanguard unjust management fees.

70.     Specifically, Harvey invested in Vanguard's Retirement Income, 2015, and 2020 Retail Funds. He held these investments in taxable accounts. In 2021, these funds distributed to him over $30,000 in capital gains. Harvey incurred a tax liability in connection with his capital gains distributions from his investments in Vanguard's Retail Funds. Additionally, Harvey paid Vanguard management fees each year.

71.     Plaintiff seeks fair compensation for the harm done to him and other taxable Retail Fund investors. Across all taxable investors, that harm is hundreds of millions of dollars or more.

72.     Plaintiff seeks an injunction forbidding Vanguard from taking actions that trigger

additional sell-offs or that further harm taxable investors in its target date funds. Despite being harmed by Vanguard, Plaintiff and class members whose shares have appreciated in value are stuck in their Retail Funds. They cannot sell the funds without incurring additional capital gains tax liability. Plaintiff and class members are thus vulnerable to future Vanguard decisions that trigger more sell-offs, or that otherwise injure taxable investors in the Retail Funds. This risk is concrete and imminent, because Vanguard has already shown a disregard for its taxable investors.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings claims on behalf of the class of: all U.S. investors in Vanguard's Retail Funds who held these funds in taxable accounts and who received 2021 capital gains distributions (the "Class").

74.     The following people are excluded from the class and the subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parent entities have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel, and their experts and consultants; and (6) the legal representatives, successors, and assignees of any such excluded persons.

### *Numerosity*

75.     The proposed Class is so numerous that joinder is impractical. Plaintiff believes that there are at least thousands, if not tens of thousands, of class members.

### *Commonality*

76.     There are questions of law and fact common to the proposed Class. Common

questions of law and fact include, without limitation: (i) whether Defendants violated their fiduciary duties; (ii) whether Defendants' violations harmed Class members; (iii) whether Defendants violated applicable consumer protection laws; and (iv) what damages are needed to compensate Class members reasonably.

### Typicality

77.    Plaintiff's claims are typical. Like the Class, Plaintiff is a taxable investor in Vanguard's Retail Funds who incurred 2021 capital gains distributions and accompanying tax liability.

### Predominance and Superiority

78.    Prosecuting separate actions would risk inconsistent outcomes and inconsistent standards for Defendants. For instance, this would risk inconsistent findings on whether Defendants breached their fiduciary duties to similarly-situated taxable investors.

79.    Common questions of law and fact predominate over any individual questions. For instance, core liability questions are common: (i) whether Defendants breached their fiduciary duties, and other legal duties; and (ii) whether class members were harmed.

80.    A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to litigate tens of thousands (or more) individual claims in separate lawsuits, every one of which presents the issues present here.

### Ascertainability

81.    The identity of Class members can be obtained from Vanguard's investment records.

## COUNT I
**Breach of Fiduciary Duty Against all Defendants**

82.     Plaintiff incorporate the facts alleged above.

83.     Plaintiff brings this claim individually and behalf of the Class.

84.     As Trustees and Officers of the Chester Funds, the Trustee and Officer Defendants owed fiduciary duties to Plaintiff and class members, including the duties of care, loyalty, and good faith.

85.      As the investment advisor and manager of the Chester Funds, the Vanguard Group owed similar fiduciary duties to Plaintiff and class members.

86.      As explained in detail above, each Defendant breached their fiduciary duties in connection with the December 2020 sell-off decision. This breach was grossly negligent, reckless, or made in bad faith. As alleged more fully above and summarized here, Defendants:

- Grossly and recklessly breached their duty of care by disregarding their duty to taxable investors, failing to consider how the decision would harm these investors, and failing to consider other options that would achieve the same goals without this harm; or

- Acted recklessly, and in bad faith, by recognizing, and consciously disregarding, the harm to taxable investors, because Defendants placed the interests of larger, institutional investors over the interests of smaller, ordinary investors.

87.      In addition, or in the alternative, the Vanguard Group aided and abetted the Trustee and Officer Defendants in breaching their fiduciary duties. As the manager and investment advisor to the Trust, the Vanguard Group knew that the Trustee and Officer Defendants were breaching their fiduciary duties, in the way alleged in detail above, and provided substantial assistance in carrying out this breach.

88.    These breaches were a direct and proximate cause of harm and damage to Plaintiff and class members.

89.    As described in detail above, Defendants acted with conscious disregard and reckless indifference to the rights of Plaintiff and class members.

## COUNT II
### Breach of the Covenant of Good Faith and Fair Dealing
### Against the Trust and Trustee and Officer Defendants

90.    Plaintiff incorporates the facts alleged above.

91.    Plaintiff brings this claim individually and on behalf of the Class. A contract was formed between (a) Plaintiff's and Class members, and (b) the Trust and Trustee and Officer Defendants, that included the Chester Funds Declaration of Trust.[25] That agreement states that it was "entered into … by the Trustees" and that "[e]very Shareholder by virtue of having become a Shareholder shall be held to have expressly assented and agreed to the terms."

92.    The contract provided the Trust and Trustee and Officer Defendants with discretion to make fund management decisions, including merging funds, altering investment minimums, and adjusting fees. This discretion included an implied duty of good faith and fair dealing.

93.    As alleged in detail above, these Defendants failed to exercise their discretion in good faith, in connection with the December 2020 sell-off decision. Each Defendant acted unreasonably and frustrated the benefits of the bargain that Plaintiff and class members reasonably expected.

94.    Defendants' breach was a direct and proximate cause of harm and damage to

---

[25] Chester Funds Declaration of Trust,
https://www.sec.gov/Archives/edgar/data/752177/000093247112001166/declarationoftrust_chesterfu.htm

Plaintiff and class members.

## COUNT III
### Unjust Enrichment Against all Defendants

95.    Plaintiff incorporates the facts alleged above.

96.    Plaintiff brings this claim individually and on behalf of the Class.

97.    This equitable claim is asserted in the alternative, if Plaintiff and class members lack an adequate contractual remedy. Plaintiff and class members paid management fees that were used to pay the Trustee and Officer Defendants, and the Vanguard Group, in exchange for managing the relevant funds with due care and in good faith.

98.    As alleged in detail above, Defendants failed to manage the funds with due care and in good faith.

99.    In this way, Defendants received a direct and unjust benefit, at the expense of Plaintiff and class members.

## COUNT IV
### Gross Negligence Against all Defendants

100.    Plaintiff incorporates the facts alleged above.

101.    Plaintiff brings this claim individually and on behalf of  the Class.

102.    As Trustees and Officers of the Chester Funds, the Trustee and Officer Defendants owed a duty of care to Plaintiff and class members.

103.    As the investment advisor and manager of the Chester Funds, the Vanguard Group also owed a duty of care to Plaintiff and class members.

104.    As explained in detail above, in connection with the 2020 sell-off decision, each Defendant grossly deviated from the standard of care. Each Defendant was indifferent to their duty to taxable shareholders and intentionally failed to perform this duty, with awareness and reckless

disregard of an extreme risk of harm to Plaintiff and class members.

      105.    Defendants' gross negligence was a direct and proximate cause of harm and damage to Plaintiff and class members.

## **PRAYER FOR RELIEF**

      106.    Plaintiff seeks the following relief for themselves and for the Class:

    i.    An order certifying the asserted claims, or issues raised, as a class action;

    ii.    A judgment in favor of Plaintiff and the proposed Class;

    iii.    Damages, including statutory, enhanced, or punitive damages where applicable;

    iv.    An injunction prohibiting Defendants from further harming class members;

    v.    Restitution;

    vi.    Disgorgement, and other just equitable relief;

    vii.    Pre- and post-judgment interest;

    viii.    Reasonable attorneys' fees and costs, as allowed by law; and

    ix.    Any additional relief that the Court deems reasonable and just.

## **JURY TRIAL DEMANDED**

    Plaintiff demands a trial by jury.

Dated: May 4, 2022

**LAW OFFICE OF LEON AUSSPRUNG, MD, LLC**

*/s/ James E. Hockenberry*
James E. Hockenberry (P.A. I.D. 91133)
1800 John F Kennedy Blvd, Suite 1500
Philadelphia, PA 19103
Tel: (215) 717-0744
Email: JH@AussprungLaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*